```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA


SPRING PHARMACEUTICALS, LLC,       :
                                   :
          Plaintiff,               :   CIVIL ACTION
                                   :
     v.                            :   No. 18-cv-04553
                                   :
                                   :
RETROPHIN, INC., MARTIN SHKRELI,   :
MISSION PHARMACAL COMPANY, and     :
ALAMO PHARMA SERVICES, INC.,       :
                                   :
          Defendants.              :
```

**MEMORANDUM**

**Joyner, J.**                                                **April 9, 2019**

Before the Court are Defendants' Motions to Dismiss and Memorandums in Support thereof (Doc. Nos. 39, 40, 41, 42, and 43) and Plaintiff's Opposition thereto (Doc. No. 50). We stay Defendants' Motions for ninety days to allow for limited jurisdictional discovery.

**I.    BACKGROUND**

This case arises from an antitrust action brought by Plaintiff Spring Pharmaceuticals, LLC ("Spring") against Defendants Retrophin, Inc. ("Retrophin"), Martin Shkreli ("Shkreli"), Mission Pharmacal Company ("Mission"), and Alamo Pharma Services, Inc. ("Alamo") (collectively, "Defendants") for allegedly anticompetitive practices in the pharmaceutical market for the tiopronin branded product that Defendants manufacture

1

and market, Thiola. Thiola is off-patent and currently the only FDA-approved tiopronin product for treatment of the rare genetic disease cystinuria, which causes recurring kidney stones. Compl. ¶¶1, 2, 49. The practices at issue are embodied by a business model in which Defendants remove Thiola from normal distribution channels and refuse to deal samples of Thiola which are necessary for any generic seeking FDA approval through the "Abbreviated New Drug Application" regulatory process. Id. ¶8, ¶29. Spring's principal claim is that Defendants violated federal antitrust laws by engaging in anticompetitive conduct to preclude Plaintiff from developing a generic competitor to Thiola and charging supracompetitive prices for its drug. Id. ¶¶9, 40, 45, 65, 67, 70, 71.

Under consideration is Defendant Retrophin's and Defendants Mission and Alamo's Motions to Dismiss for lack of subject-matter jurisdiction under Fed. R. Civ. P. 12(b)(1), in which they are challenging Spring's constitutional standing, Defendant Shkreli's joinder thereto, and Plaintiff's Opposition thereto. The Court has considered the parties' submissions and decides this matter without oral argument. Fed. R. Civ. P. 78; Loc. R. Civ. P. 7.1 (f).

**II. Alleged Facts**

Spring alleges that it is a new pharmaceutical company, formed with the intention of developing a generic drug to

compete with the subject medication in this litigation, Thiola, the branded drug manufactured and marketed by Defendants. Thiola is an off-patent, prescription pharmaceutical product, not subject to regulations restricting generic development, with active ingredient tiopronin. Compl. ¶2. Thiola is used to treat patients with a chronic genetic disease, cystinuria, which causes recurring kidney stones. Id. ¶¶2, 88. Cystinuria affects approximately 1 in every 10,000 people with approximately 20,000 cases in the United States at present. Id. ¶ 82. Based on Retrophin's own reports, sales of Thiola have increased from nearly $55 million in 2015 to $71 million in 2016, and $82 million in 2017. Id. ¶87 n.49 (citing Retrophin Inc., Annual Report 46 (Form 10-K) (Feb. 27, 2018)).

Currently, Thiola is the only tiopronin drug with FDA approval. Id. ¶2. Plaintiff alleges that "there are no substitutes for Thiola," Id. ¶83, making demand for the drug inelastic. Other drugs, including Cuprimine (active ingredient, penicillamine) and Depen (a branded generic of penicillamine) have been FDA approved for treating cystinuria, yet they are "primarily indicated for a different disease," and have been "targeted" as less effective and safe than Thiola for treating cystinuria. Id.; Def. Retrophin Br. at 13, n. 3, Bansal Decl. Ex. A.

With the intention of ensuring the availability of "low-cost, generic drugs for millions of Americans," see 21 U.S.C.S. § 355, in 1984 Congress enacted the Drug Price Competition and Patent Term Restoration Act ("Hatch-Waxman Act" or "Hatch-Waxman"), which provided a streamlined process for regulatory approval of generic drugs. Unlike the lengthy clinical trials necessary for "New Drug Applications" ("NDAs"), the alternative "Abbreviated New Drug Applications" ("ANDAs") allow generic manufacturers to "rely on the FDA's previous finding of safety and effectiveness with respect to the brand product – so long as the firm is able to demonstrate that the proposed generic is biologically equivalent to, and has the same active ingredients, route of administration, dosage form, strength, labeling, and conditions of use as, that brand drug." Compl. ¶30; see 21 U.S.C.S. §§ 355(j)(2)(A)(i)-(v). This showing is also referred to as "bioequivalence." The ANDA regulatory shortcut, by "allowing the generic to piggyback on the pioneer's approval efforts, 'speed[s] the introduction of low-cost generic drugs to market,' [and] thereby further[s] drug competition. FTC v. Actavis, Inc., 570 U.S. 136, 143 (2013) (citing Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 405 (2012)).

Central to Plaintiff's Complaint in this litigation, a generic drug manufacturer seeking to enter the pharmaceutical market through the abbreviated ANDA process must acquire samples

4

of the listed drug[1] in order to demonstrate bioequivalence. The FDA has instructed, "[g]eneric manufacturers need anywhere from 2,000 to 5,000 doses of the branded drug in order to run studies to prove their generic medicine is the same [i.e. as safe and effective] as the branded drug." Compl. ¶33.[2] Once a manufacturer demonstrates bioequivalence, the generic may be subject to "substitution" laws adopted by most states, including Pennsylvania. Id. ¶35. These state Drug Product Selection ("DPS") laws allow, and sometimes require, pharmacists to substitute generic versions of branded prescriptions, unless a doctor provides otherwise.[3]

With this regulatory framework in mind, we turn to the parties in this litigation. Mission manufactured and marketed Thiola since 1988, id. ¶¶7-9, until it entered an agreement with Retrophin in 2014, granting Retrophin an exclusive license to market, sell, and commercialize Thiola in the United States. ¶¶7, 19. Defendant Shkreli, CEO of Retrophin until October, 2014, ¶13, signed the exclusive licensing agreement between

---

[1] A "list drug" refers to "the particular FDA-approved brand drug at issue." Compl. ¶31, §§ 355(j)(7).

[2] Statement from FDA Commissioner Scott Gottlieb, M. D., on new agency actions to further deter 'gaming' of the generic drug approval process by the use of citizen petitions, U.S. FOOD & DRUG ADMIN. (Oct. 2, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm622252.htm.

[3] Martin H. Redish and Sopan Joshi, Litigating Article IIII Standing: A Proposed Solution to the Serious (But Unrecognized) Separation of Powers Problem, 162 U. Penn. L. Rev. 1373, 1381 (2014).

5

Retrophin and Mission, ¶¶20-22, that extends through May 2029. ¶63. Defendant Alamo is a "wholly-owned subsidiary of Mission and provides exclusive sales services to Retrophin under the [licensing] Agreement." ¶¶20, 22.

At the heart of Plaintiff Spring's Complaint are allegations that Defendants acted in concert to block Spring's access to samples of Thiola that it needs to develop a generic competitor. ¶8. Defendants challenge the factual basis for Spring's constitutional standing. See Def. Retrophin Br. at 20-23 (Doc. No. 42); Defs. Mission and Alamo Br. at 13-15 (Doc. No. 41); Def. Shkreli Br. (Doc. No. 40). Therefore, before we may address the merits of Spring's allegations, we must address whether Spring has constitutional standing to sue.

**III. Legal Standard**

A party may assert the defense of lack of subject-matter jurisdiction on motion. Fed. R. Civ. P. 12(b)(1). There is a "crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). See Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000) ("[a] Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction.").

6

A facial attack provides similar procedural protections to a Rule 12(b)(6) "determination on the merits," which affords "the safeguard of having all its allegations taken as true" and all inferences drawn in favor of the plaintiff. Mortensen, 549 F.2d at 891. On a factual attack by contrast, "there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations," because the court's "very power to hear the case" is in issue. Id. [4] See also S.D. v. Haddon Heights Bd. of Educ., 722 F. App'x 119, 124 n. 7 (3d Cir. 2018) (citing Constitution Party v. Aichele, 757 F.3d 347, 358 (3d Cir. 2014 (internal citations omitted))(supporting the Third Circuit's view that since "a factual challenge 'concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites,'" we are permitted to "independently evaluate all the evidence to resolve disputes over jurisdictional facts."). E.g., CNA, 535 F.3d at 139

---

[4] See id. at 1376 (arguing that in the interest of avoiding pressuring defendants to settle before a case or controversy has been conclusively established, "it is critical to resolve disputes over subject matter jurisdiction (both legal and factual) at the very outset of litigation." Waiting to resolve standing until as late as trial is permissible under the Supreme Court's approach to standing analyses as set forth in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). However, "[b]y deferring resolution of the standing issue, courts force defendants into a Hobson's choice—either incur the expense of litigation or settle the case—without having conclusively established the existence of a valid case or controversy.").

7

(quoting United States ex rel. Atkinson v. Pa. Shipbuilding Co., 473 F.3d 506, 514 (3d Cir. 2007)) (holding we have authority to 'make factual findings which are decisive to the issue.'"). On a factual attack under Rule 12(b)(1), the "burden of proving subject matter jurisdiction [is] on the plaintiff." Id.

A factual challenge under Rule 12(b)(1) may be made prior to service of an answer. Berardi v. Swanson Mem'l Lodge No. 48 of Fraternal Order of Police, 920 F.2d 198, 200 (3d Cir. 1990). Although Plaintiff contends that a defendant's factual attack on jurisdiction may not be made "until after answering the complaint," Pl. Opp. at 51 n. 40, the Third Circuit has clarified, "[a]lthough dictum in Mortensen seems to support [Spring's] argument, we are convinced that the argument is wrong." Id. See id. ([T]he requirement in [Rule] 12(b) that a motion to dismiss for lack of jurisdiction must be made before pleading if a further pleading is required would make little sense if the factual basis for subject matter jurisdiction could not be contested until after an answer is filed.").

## IV. Discussion

Plaintiff Spring asserts that it has constitutional standing to bring this antitrust cause of action against Defendants. In short, Spring argues it is a pharmaceutical company that has taken substantial steps toward developing a generic version of Defendants' drug, Thiola, and that but for

8

Defendants' refusal to sell samples of Thiola to distributors, wholesalers, or Plaintiff, Plaintiff is precluded from developing a generic competitor, and Defendant continues to unlawfully monopolize the tiopronin market.

Pursuant to Fed. R. Civ. P. 12(b)(1), Defendant Retrophin mounts a factual attack to Plaintiff Spring's constitutional standing. Accordingly, Retrophin seeks "limited discovery to test Spring's assertions." Def. Retrophin Br. at 20.

Constitutional standing and antitrust standing are distinct. Phila. Taxi Ass'n v. Uber Techs., 886 F.3d 332, 343 (3d Cir. 2018) (citing Ethypharm S.A. Fr. v. Abbott Labs., 707 F.3d 223, 232 (3d Cir. 2013). "In order to establish an actionable antitrust violation, a plaintiff must plead a basis for both Article III and antitrust standing." Schuylkill Health Sys. v. Cardinal Health 200, LLC, No. 12-7065, 2014 U.S. Dist. LEXIS 103663 at *8 (E.D. Pa. July 30, 2014). "While '[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact,' courts must also consider 'whether the plaintiff is a proper party to bring a private antitrust action.'" Phila. Taxi Ass'n v. Uber Techs., 886 F.3d 332 (3d Cir. 2018) (quoting Associated Gen. Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 535 n. 31 (1983)). "Because antitrust standing is prudential, we are not bound to address it first, because it 'does not

9

affect the subject matter jurisdiction of the court, as Article III standing does.'" Phila. Taxi Ass'n v. Uber Techs., 886 F.3d 332 n. 7 (3d Cir. 2018) (quoting Ethypharm S.A. Fr., 707 F.3d at 232). Furthermore, the Third Circuit has indicated that antitrust standing is "one of the prudential limitations" on constitutional standing and is part of the merits analysis. Ethypharm S.A. Fr., 707 F.3d at 232.[5] "Regardless of any additional requirements applicable to a particular type of action, a plaintiff must always demonstrate that a justiciable case or controversy exists sufficient to invoke the jurisdiction of the federal courts." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 302 (3d Cir. 2012) (citing Sullivan v. D.B. Invs., Inc., 667 F.3d 273, 307 (3d Cir. 2011)).

To satisfy the threshold Article III standing requirements, a plaintiff's allegations must show "(1) an injury that is (2) 'fairly traceable to the defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.'" Lujan, 504 U.S. at 590 (quoting Allen v. Wright, 468

---

[5] See Ethypharm S.A. Fr., 707 F.3d at 232 n.17 (quoting Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1299 (11th Cir. 2010)) (noting that the Third Circuit is persuaded by the Eleventh Circuit's view that antitrust standing requires a plaintiff "do more than meet the basic 'case or controversy' requirement that would satisfy constitutional standing; instead, the party must show that it satisfies a number of prudential considerations aimed at preserving the effective enforcement of the antitrust laws.").

U.S. 737, 751 (1984)). Accord Ballentine v. United States, 486 F.3d 806 (3d Cir. 2007). First, the injury-in-fact must be "distinct and palpable," Danvers Motor Co., Inc. v. Ford Motor Co., 432 F.3d 286, 291 (3d Cir. 2005), "concrete and particularized," Askew v. Trs. of the Gen. Assembly of the Church of the Lord Jesus Christ of the Apostolic Faith, Inc., 776 F. Supp. 2d 25, 29 (E.D. Pa. 2011), as well as "actual or imminent, not 'conjectural' or 'hypothetical,'" Lujan, 504 U.S. at 560 (quoting Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)). Second, Plaintiff's allegations must show a "causal connection" between their injury and Defendants' allegedly illegal conduct. "[T]hat is, the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Id. (quoting Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26 (1976)). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" Id. at 561 (quoting Simon, 426 U.S. at 38, 43). "These requirements ensure that plaintiffs have a 'personal stake' or 'interest' in the outcome of the proceedings, 'sufficient to warrant . . . [their] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on . . .[their] behalf.'" Joint Stock Soc'y v. UDV N.

Am., Inc., 266 F.3d 164, 176 (3d Cir. 2001) (quoting Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537-38 (3d Cir. 1994)).

When a Plaintiff seeks injunctive relief, as Spring does here, Plaintiff must show that the threat of injury-in-fact is "imminent." ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 301 (3d Cir. 2012) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493 (2009)). "A mere 'possibility' of future injury is insufficient." In re Thalomid & Revlimid Antitrust Litig., Civil Action No. 14-6997, 2018 U.S. Dist. LEXIS 186457 at *28 (D.N.J. Oct. 30, 2018) (quoting ZF Meritor, 696 F.3d at 301 (quoting City of Los Angeles v. Lyons, 461 U.S. 95 (1983))). The "imminence" inquiry focuses on whether Plaintiffs can show "sufficient facts" to support the conclusion that they are "*likely* to suffer future injury;" McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 (3d Cir. 2012)(citation omitted); or, in other words that future injury is "certainly impending and [will] proceed with a high degree of certainty." McCray v. Fid. Nat'l Title Ins. Co., 682 F.3d 229, 243 (3d Cir. 2012). "Vague" assertions of desire [to enter the relevant pharmaceutical market] "without any descriptions of concrete plans," are insufficient to support a finding of actual or imminent injury." ZF Meritor, 696 F.3d at 301 (citing Summers, 555 U.S. at 496). Additionally, to have constitutional standing, a plaintiff seeking an injunction must show "'continuing, present adverse

effects'" of defendant's challenged conduct." Id. (quoting O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)). The party "invoking federal jurisdiction[,] bears the burden of establishing" the elements of standing. Id. at 561.

"It is well settled that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather must affirmatively appear in the record (internal citations omitted)." Askew, 776 F. Supp. at 28 (quoting Grace v. Am. Cent. Ins. Co., 109 U.S. 278, 284 (1883)). As in Askew, "[b]ecause defendants present factual evidence of [Spring's] lack of standing, we will treat this motion accordingly." Id.

Defendants argue Spring lacks constitutional standing. In their "factual attack," Defendants assert that "Spring is not a generic pharmaceutical company; it has not developed, is not developing, and is not 'ready to begin development' of a generic version of tiopronin. Rather, it is a company apparently formed by a former associate of Winston & Strawn (litigation counsel in this lawsuit), and his wife, a CPA, as a vehicle to bring this litigation." Def. Retrophin Br. at 20. To support their theory, Defendants contend that Spring does not have an office, only a "'virtual' and shared workspace," Bansal Decl. Ex. M; that their co-founder, Mr. Li, has been kept "apprised of developments in antitrust law," by virtue of his background as a lawyer, Def. Retrophin Br. at 14, and that Spring lacks the

13

financial and scientific capabilities to develop a generic and submit an ANDA for FDA approval. Defendants Mission and Alamo additionally argue that Spring is not authorized under state or federal law to be sold prescription drugs. Defs. Mission and Alamo Br. at 14, Doc. No. 41.

Plaintiff rebuts Defendants' factual attack, putting forth three arguments. First, Plaintiff asserts it is a new pharmaceutical company formed with the intent of developing a generic version of Thiola. Second, Plaintiff asserts it has taken substantial steps to develop a generic version of Defendants' drug, which can be completed once it is able to acquire Thiola samples for bioequivalence testing. Third, Plaintiff asserts it has communicated with consultants to help navigate the regulatory process of filing an abbreviated new drug application, and that it has secured financing to bring its generic product to market, pending access to Thiola samples. See Pl. Opp. at 49-50, Doc. No. 50.

To support its claim of standing, Plaintiff alleges that in November, 2017, Spring Pharmaceuticals "was formed as a family-run business" with the "mission . . . to develop lower-priced pharmaceutical products to compete with off-patent and off-exclusivity brand drugs." Li Decl. ¶¶2, 8; Doc. No. 50, Ex. 1. Plaintiff avers that it is "currently . . . developing a generic version of Thiola." Id. Plaintiff disputes Defendants'

14

assertion that Spring was formed only as a pretext for filing this litigation, and that Mr. Li's background in antitrust litigation indicates that Spring is a shell-company. Plaintiff attests that before his legal career, Mr. Li worked for "seven years on projects for Aventis ([a] pharmaceutical manufacturer), Cytyc ([a] medical device manufacturer), and AstraZeneca ([a] pharmaceutical manufacturer)." Id. ¶4. Notably, Mr. Li asserts that his background in the pharmaceutical industry includes having worked at SPH Sine Pharmaceutical Laboratories Co., LTD. ("Sine Pharma"), an eminent Chinese-based pharmaceutical company, which manufactures a tiopronin product with the same "active ingredient" as Thiola. Id. ¶6-7.

Next, to dispute Defendants' allegation that "the only two individuals Retrophin has been able to identify as being affiliated with Spring in any way are 'its CEO,' Mr. Li. . .and his wife, Ms. Hua," "who according to publicly available materials is a Certified Public Accountant ('CPA') employed by Freddie Mac," Def. Retrophin Br. at 11 and 14, Plaintiff asserts that "[t]he other co-founder of Spring Pharmaceuticals, also one of [Mr. Li's] family members, had more than 30 years of experience in the pharmaceutical industry in China before he retired from SPH Sine Pharmaceutical Laboratories Co., Ltd." Li. Decl. ¶6. This co-founder has yet to be named in the parties' pleadings. Additionally, Plaintiff asserts that its

15

"Chief Scientific Officer," Pl. Opp. at 51, although not named, is a partner in the consulting firm with which Spring has an agreement to "oversee the development work and prepare Spring's ANDA submission." Id.; Compl. ¶12.

In rebuttal to Defendants' attack on Plaintiff's preparedness, Spring asserts it is "ready and able" to compete, "except for its lack of access to samples." Compl. ¶68; Li. Decl. ¶10. Specifically, in accordance with a "well-developed business model in the pharmaceutical industry" of partnering with contract development and manufacturing organizations ("CDMOs"), to avoid capital-intensive costs of drug development, Plaintiff asserts it has "an agreement" with a CDMO experienced in launching generic drugs; Li. Decl. ¶11; and that it has "an agreement with a consulting firm" to assist it in navigating the regulatory requirements of submitting an ANDA. Id. ¶12.

Additionally, Plaintiff disputes Defendant Mission's argument that Spring is "not registered in the FDA database of 'drug establishments,'" nor authorized by the relevant state and federal authorities to receive prescription drugs (were Mission to sell Plaintiff Thiola samples). Def. Mission Br. at 14, Doc. No. 41 (citing 25 Tex. Admin. Code § 229.429(f)(2) (2010)). In rebuttal, Plaintiff asserts that the CDMO with which it has an "agreement" is registered as a 'drug establishment' with the FDA, Li. Decl. ¶11, and that it is "commonplace with

16

pharmaceutical outsourcing [for] all product samples, active pharmaceutical ingredients, and other chemical products [to] be shipped directly to the CDMO's facilities." Id.

Although Plaintiff has not named the CDMO, the consulting firm, nor the Chief Scientific Officer with whom it alleges it has entered agreements as part of its preparation for developing a generic competitor to Thiola, Plaintiff attests that it has not revealed the identity of its partners due to "confidentiality agreements. . .which prohibit the disclosure of confidential contract terms and/or its partners' identities without a court order requiring such disclosure and/or without the benefit of a protective order entered by the court." Id. ¶11 n. 8.

Finally, with regard to its financial preparedness to enter the pharmaceutical market as a generic competitor to Thiola, Plaintiff alleges that it "has received funding from Vannin Capital LLC ("Vannin")" as well as from "other investors," and that Mr. Li, a co-founder of Spring, has "contributed personal funds to the company." Id. ¶13. Defendants retort that "[t]he only public record of Spring's funding sources" is the Vannin lien, "filed on August 10, 2018, two months before" this lawsuit. Bansal Decl., Ex. N.

Considering that Spring has rebutted Defendants' jurisdictional challenge, we stay Defendants' motions for a

period of ninety days to allow for discovery limited to the question of whether Plaintiff Spring has standing to sue under Article III.  See Askew, 776 F. Supp. 2d at 28 (ordering "standing-related discovery and den[ying] defendants' motion to dismiss without prejudice pending the completion of that discovery").[6]  That being said, we note that Mortensen warns that "the 'concededly rigorous standard' [applied by Hospital Building Co. v. Rex Hospital, 425 U.S. 738 (1976)], would apply equally in dismissals pursuant to Fed. R. Civ. P. 12(b)(1) [as they would to motions under 12(b)(6)] and that dismissals of Sherman Act claims prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." Mortensen, 549 F.2d at 891.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss are stayed.  An appropriate Order will follow.

---

[6] See Redish and Joshi, 162 U. Penn. L. Rev. at 1378 ("The Court should instruct lower courts to resolve questions about Article III standing as soon as its existence is put into doubt. Specifically, courts should address all factual issues relevant to standing by conducting limited discovery and making credibility determinations without inferences in favor of the plaintiff. This proposal requires all issues of standing to be raised on a Rule 12(b)(1) motion to dismiss.").