**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SPRING PHARMACEUTICALS, LLC,<br>            Plaintiff, | CIVIL ACTION |
| v. | |
| RETROPHIN, INC., MARTIN<br>SHKRELI, MISSION PHARMACAL<br>COMPANY, and ALAMO PHARMA<br>SERVICES, INC.,<br>            Defendants. | NO.  18-4553 |

**MEMORANDUM**

**Joyner, J.**                                    **December 11, 2019**

Presently before the Court are Defendants' Motions to Dismiss the Complaint for lack of standing under Fed. R. Civ. P. 12(b)(1), lack of personal jurisdiction under Rule 12(b)(2), and failure to state a claim under Rule 12(b)(6). (Defs. Mission/Alamo Motion to Dismiss, Doc. No. 40; Def. Retrophin Motion to Dismiss, Doc. No. 42; Def. Shkreli Motion to Dismiss, Doc. Nos. 39, 43.) For the reasons that follow, the Motions will be granted in part and denied in part.

**Factual Background**

This is an antitrust action concerning the market for a prescription drug called Thiola. Under federal and state antitrust laws, Plaintiff Spring Pharmaceuticals, LLC ("Spring") seeks monetary and injunctive relief against Defendants Retrophin, Inc. ("Retrophin"), Martin Shkreli ("Shkreli"),

Mission Pharmacal Company ("Mission"), and Alamo Pharma Services, Inc. ("Alamo"). Plaintiff Spring is a pharmaceutical company formed for the purpose of developing a generic version of Thiola through the FDA's Abbreviated New Drug Application ("ANDA") process. Thiola is off-patent and currently the only FDA-approved tiopronin product for treatment of the rare genetic disease cystinuria, which causes recurring kidney stones. In order to develop a generic through the ANDA process, a manufacturer must demonstrate that the generic is bioequivalent to the brand version. In order to demonstrate bioequivalence, the generic manufacturer must obtain samples of the brand drug. At the crux of Plaintiff's claims, Plaintiff alleges that Defendants violated antitrust laws by refusing to sell to Plaintiff samples of Thiola and that this allegedly anticompetitive conduct has excluded Plaintiff from the tiopronin market.

Plaintiff has asserted the following claims in its Complaint: Count I (Mandatory Injunctive Relief pursuant to 15 U.S.C. § 26 and Fed. R. Civ. P. 65 against all Defendants); Count II (monopolization and/or attempted monopolization under Sherman Act Section 2 against Retrophin); Count III (conspiracy to monopolize under Sherman Act Section 2 against all Defendants); Count IV (contract in restraint of trade under Sherman Act Section 1 against all Defendants); Count V (unfair

2

competition under Pennsylvania common law against all
Defendants); and Count VI (unjust enrichment under Pennsylvania
common law against all Defendants) (Pl. Compl., Doc. No. 1 at
37).

## **Analysis**

### *Motions to Dismiss Under Fed. R. Civ. P. 12(b)(1) for Lack of Subject Matter Jurisdiction*

Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1)
on grounds that Plaintiff lacks constitutional standing under
Article III of the Constitution. See Ballentine v. United
States, 486 F.3d 806, 810 (3d Cir. 2007) ("Federal Rule of Civil
Procedure 12(b)(1) provides that a party may bring a motion to
dismiss for lack of subject matter jurisdiction . . . . A motion
to dismiss for want of standing is . . . properly brought
pursuant to Rule 12(b)(1), because standing is a jurisdictional
matter."). Defendants argue that their attack is factual, not
facial. This Court previously stayed the case to allow for
discovery on the issue of whether Plaintiff has Article III
standing. Spring Pharm., LLC v. Retrophin, Inc., 2019 WL
1558744, at *1 (E.D. Pa. Apr. 10, 2019). The stay has ended,
and, in Plaintiff's Supplemental Brief Establishing Article III
Standing, Plaintiff requests that the Court Deny Defendants'
challenges to Plaintiff's Article III standing and direct that
discovery should proceed. (Doc No. 81.)

I.   **Monetary Relief**

   *a. Factual Challenges Versus Facial Challenges*

Courts distinguish between facial attacks under Rule 12(b)(1) and factual attacks under Rule 12(b)(1). <u>Constitution Party of Pennsylvania v. Aichele</u>, 757 F.3d 347, 357 (3d Cir. 2014); <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>, 549 F.2d 884, 891 (3d Cir. 1977).

A factual attack addresses "'the actual failure of [a plaintiff's] claims to comport [factually] with the jurisdictional prerequisites.'" <u>CNA v. United States</u>, 535 F.3d 132, 139 (3d Cir. 2008), <u>as amended</u> (Sept. 29, 2008). <u>See also</u> <u>Edmonson v. Lincoln Nat. Life Ins. Co.</u>, 777 F. Supp. 2d 869, 877 (E.D. Pa. 2011). During a factual attack, the Court may make factual determinations to decide whether the Court has subject matter jurisdiction. <u>CNA</u>, 535 F.3d at 139; <u>Mortensen</u>, 549 F.2d at 891, n.16 ("That the district court is free to determine facts relevant to its jurisdiction has long been clear."). Additionally, the plaintiff has the burden of proving subject matter jurisdiction. <u>Davis v. Wells Fargo</u>, 824 F.3d 333, 349 (3rd Cir. 2016) ("[T]he plaintiff must prove the court has subject matter jurisdiction."); <u>CNA</u>, 535 F.3d at 139 ("[T]he Court placed the burden of proving subject matter jurisdiction on the plaintiff."). Further, there is no presumption of truthfulness for the plaintiff's allegations. <u>CNA</u>, 535 F.3d at

4

139 ("'[N]o presumption of truthfulness attaches to the
allegations of the plaintiff.'"); <u>Mortensen</u>, 549 F.2d at 891.
The Court may consider evidence outside of the pleadings. <u>CNA</u>,
535 F.3d at 145 ("The District Court applied Rule 12(b)(1), with
its attendant procedural consequences, properly. The Government
made a factual attack on the existence of subject matter
jurisdiction . . . . The District Court was permitted to make
factual findings, beyond the pleadings, that were decisive to
determining jurisdiction."). For instance, Courts have
"'discretion to allow affidavits, documents, and even limited
evidentiary hearings' in weighing the evidence on a factual
attack." <u>Edmonson</u>, 777 F. Supp. 2d at 877-78. Additionally, if
there are disputes of material facts, Courts in this
jurisdiction "must permit the case to proceed to a plenary trial
on the contested issues so that it may resolve the question of
its jurisdiction even while hearing proofs that are equally
pertinent to the merits." <u>Int'l Ass'n of Machinists & Aerospace</u>
<u>Workers v. Nw. Airlines, Inc.</u>, 673 F.2d 700, 712 (3d Cir. 1982).
Lastly, the defendant may "attack the allegations in the
complaint and submit contrary evidence in its effort to show
that the court lacks jurisdiction." <u>Davis</u>, 824 F.3d 333, 349
(3rd Cir. 2016).

In contrast to a factual attack, a facial attack "concerns
'an alleged pleading deficiency . . . . '" <u>CNA</u>, 535 F.3d 132,

139 (3d Cir. 2008). <u>See also</u> <u>Edmonson</u>, 777 F. Supp. 2d at 877.
During a facial attack under Rule 12(b)(1), the Court must
determine whether the pleadings, on their face, adequately
allege subject matter jurisdiction. <u>Constitution Party</u>, 757 F.3d
347 at 358 ("A facial attack . . . is an argument that considers
a claim on its face and asserts that it is insufficient to
invoke the subject matter jurisdiction of the court . . . .").
As with motions to dismiss under Rule 12(b)(6), Courts must
"only consider the allegations of the complaint and documents
referenced therein and attached thereto, in the light most
favorable to the plaintiff." <u>Constitution Party</u>, 757 F.3d at
358.

### b. Article III's Requirements for Constitutional Standing

In order to satisfy constitutional standing requirements
under Article III, a plaintiff must adequately allege (1) an
injury-in-fact that is (2) "fairly traceable to the defendant's
allegedly unlawful conduct and that is (3) likely to be
redressed by the requested relief." <u>Lujan v. Defs. of Wildlife</u>,
504 U.S. 555, 590 (1992) (internal citations omitted). <u>See also</u>
<u>Ballentine</u>, 486 F.3d at 814; <u>In re Suboxone (Buprenorphine</u>
<u>Hydrochloride & Naloxone) Antitrust Litig.</u>, 64 F. Supp. 3d 665,
691-92 (E.D. Pa. 2014), <u>on reconsideration in part sub nom. In</u>
<u>re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust</u>
<u>Litig.</u>, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015).

The constitutional standing assessment is separate from the assessment of the merits. Cottrell v. Alcon Labs., 874 F.3d 154, 162 (3d Cir. 2017), cert. denied sub nom. Alcon Labs., Inc. v. Cottrell, 138 S. Ct. 2029 (2018) ("[W]e separate our standing inquiry from any assessment of the merits of the plaintiff's claim. To maintain this fundamental separation between standing and merits at the dismissal stage, we assume for the purposes of our standing inquiry that a plaintiff has stated valid legal claims."). When standing and merits are intertwined such that material facts go to both factual issues and standing issues, a Court adjudicating a Rule 12(b)(1) motion must "demand less in the way of jurisdictional proof than would be appropriate at a trial stage," Davis, 824 F.3d at 349-350 (internal quotations omitted), and should grant motions to dismiss "sparingly." Id. at 348-350 ("[W]hen a factual challenge to jurisdiction attacks facts at the core of the merits of the underlying cause of action, 'the proper procedure for the district court is to find that jurisdiction exists and to deal with the objection as a direct attack on the merits of the plaintiff's case' . . . . dismissal via a Rule 12(b)(1) factual challenge to standing should be granted sparingly."); CNA, 535 F.3d at 145. Thus, our standing analysis is limited to whether Plaintiff has constitutional standing; whether Defendants actually delayed Plaintiff's market entry illegally and whether Plaintiff is

7

actually entitled to relief are merits questions that cannot be resolved during the constitutional standing inquiry. See id. See also Edmonson, 777 F. Supp. 2d at 880 ("The extent of plaintiff's loss . . . was a question of damages (to be calculated after the benefit of discovery), rather than injury in fact.").

First, an injury-in-fact is "an invasion of a legally protected interest which is . . . concrete and particularized[,] . . . actual or imminent, not conjectural or hypothetical . . . ." Ballentine, 486 F.3d 806, 814 (3d Cir. 2007). See also Lujan, 504 U.S. at 560. The injury-in-fact element "is very generous to claimants, demanding only that the claimant allege[ ] some specific, identifiable trifle of injury." In re Remicade Antitrust Litig., 345 F. Supp. 3d 566, 584 (E.D. Pa. 2018) (internal quotations omitted) (alteration in original). Financial harm, even if minor, is a classic type of injury-in-fact. Cottrell, 874 F.3d at 163 ("[F]inancial harm is a 'classic' and 'paradigmatic form[ ]' of injury in fact . . . . 'Any monetary loss suffered by the plaintiff satisfies [the injury-in-fact] element; "[e]ven a small financial loss" suffices . . . .'"); Remicade, 345 F. Supp. 3d at 584 ("'[T]he Supreme Court has repeatedly recognized that financial or economic interests are "legally protected interests" for purposes of the standing doctrine.'"). Here, Plaintiff alleges

financial harm that includes alleged lost sales and profits from Defendants' allegedly anticompetitive actions of excluding Plaintiff from the market. (Doc. No. 1 ¶¶105, at 37.) To rebut this, Defendants argue that Plaintiff is merely a shell company created for this litigation. (Def. Retrophin Memorandum in Support of Retrophin's Motion to Dismiss, Doc. No. 42-1 at 11.) After jurisdictional discovery, the parties do not appear to dispute that Plaintiff was founded on November 6, 2017,[1] which was over eleven months before bringing this suit on October 23, 2018, (Doc. No. 1); that Plaintiff repeatedly sought samples from Defendants;[2] and that, before Plaintiff filed this suit, a contract development and manufacturing organization ("CDMO") signed and sent a proposal to Plaintiff.[3] Unlike the Lujan, 504 U.S. 555 respondents, who lacked concrete plans and, thus, injury-in-fact, Plaintiff here has suffered an actual injury. Lujan, 504 U.S. at 564 ("Such 'some day' intentions - without any description of concrete plans, or indeed even any specification of when the some day will be - do not support a finding of the 'actual or imminent' injury that our cases require."). And even if Plaintiff's financial harm is only minor, Plaintiff has still alleged an economic injury. Thus, we

---

[1] (Doc. No. 91 at 2; Doc. No. 81, Ex. 1.)
[2] (See Doc. No. 81, Ex. 25; id., Ex. 26; id., Ex. 27; id., Ex. 28; id., Ex. 29; id., Ex. 32; id., Ex. 34; id., Ex. 35; Doc. No. 91, Ex. F.)
[3] (Doc. No. 81, Ex. 14.)

hold that Plaintiff has alleged an injury-in-fact under
constitutional standing requirements.

Second, to show that its injury-in fact is fairly traceable
to the Defendants' allegedly unlawful conduct, Plaintiff must
show "a causal connection between the injury and the conduct
complained of - the injury has to be 'fairly . . . trace[able]
to the challenged action of the defendant, and not . . . th[e]
result [of] the independent action of some third party not
before the court.'" Id. at 560. See also Cottrell, 874 F.3d at
164 ("[T]he interest asserted must be 'related to the injury in
fact . . . .'" ). Here, the parties do not appear to dispute
that Plaintiff sought samples of Thiola.[4] Additionally, as in
Cottrell, 874 F.3d 154, Plaintiff claims an economic interest in
the money that it alleges it would have received had Defendants
not allegedly delayed its market entry. Cottrell, 874 F.3d at
165. But for Defendants' allegedly illegal conduct, Plaintiff
has demonstrated that it would have purchased the samples needed
to begin production.[5] Thus, as in Cottrell, 874 F.3d 154,
Plaintiff's alleged injury is fairly traceable to Defendants'
allegedly illegal conduct.

Third, in order to satisfy the "redressability"
requirement, Plaintiff must show that it is "'likely,' as

---

[4] (See Doc. No. 81, Exs. 25-29, 32, 34-35; Doc. No. 91, Ex. F.)
[5] (See Doc. No. 81, Exs. 25-29, 32, 34-35; Doc. No. 91, Ex. F. See also Doc.
No. 81, Exs. 1, 14; Doc. No. 91 at 2.)

opposed to merely 'speculative,' that the injury will be 'redressed by a favorable [judicial] decision.'" Lujan, 504 U.S. at 561. See also Cottrell, 874 F.3d at 162; Remicade, 345 F. Supp. 3d at 584. It is well-established that money damages redress injuries-in-fact and, thus, satisfy the redressability requirement. Montanez v. HSBC Mortg. Corp. (USA), 876 F. Supp. 2d 504, 512 (E.D. Pa. 2012) ("[M]oney damages . . . [are] a 'very conventional remedy' that 'would do much to redress their injuries.'"). Here, as a matter of law, the money damages that Plaintiff seeks would redress its alleged injury-in-fact. Similarly, as in Edmonson, 777 F. Supp. 2d 869, Plaintiff's claim for disgorgement is redressable. Edmonson, 777 F. Supp. 2d at 881. The amount of monetary relief that Plaintiff is entitled to is not relevant to constitutional standing. Id. at 880.

Thus, after reviewing the record after jurisdictional discovery, we find that there are no disputes of material fact as to the issue of constitutional standing, and we hold that Plaintiff has standing under Article III of the Constitution for its claims for monetary relief. Our holding "that Plaintiff has standing is consistent with the liberal approach of the Third Circuit to challenges to subject matter jurisdiction." Id. at 883.

11

## II.   Mootness Doctrine

"A case becomes moot – and therefore no longer a "Case" or "Controversy" for purposes of Article III – "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013).

However, under the voluntary cessation doctrine, a case does not become moot simply because the defendant stops its allegedly illegal conduct. <u>Id.</u> at 91 ("[A] defendant cannot automatically moot a case simply by ending its unlawful conduct once sued . . . . Otherwise, a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."). Additionally, "'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" <u>Id.</u> (internal citation omitted).

In arguing that Plaintiff's request for injunctive relief is not moot, Plaintiff asserts that Defendant Retrophin is refusing to sell samples of Thiola EC – a newer formulation of Thiola. (Pl. Reply Brief in Support of its Supplemental Brief, Doc. No. 95 at 8.) However, the original Complaint sought an injunction requiring Defendants to sell only Thiola, not Thiola

12

EC. (Doc. No. 1 at 37 ("Plaintiff . . . requests . . . the following relief: (a) Compelling Defendants to sell Plaintiff sufficient quantities of Thiola at market prices so that Plaintiff may conduct bioequivalence testing . . . .").) Thus, we only consider Plaintiff's request for injunctive relief as to Thiola, not as to Defendants' other formulations.

The parties do not contest that Defendant Retrophin eventually agreed to sell samples of Thiola to Plaintiff. (Def. Retrophin's Opposition to Spring Pharmaceutical's Supplemental Brief, Doc. No. 91, at 9; Doc. No. 81, Ex. 36; Doc. No. 91, Ex. V.) Defendant does not contest that Plaintiff has accepted and remitted payment to Retrophin. (See Doc. No. 95, at 5; id., Exs. 1, 2.) Thus, the question for the Court is whether, under the voluntary cessation doctrine, Defendants have met their burden of demonstrating that the case is moot. Here, because Defendant has agreed to sell samples to Plaintiff and Plaintiff has already purchased the Thiola samples from Defendant Retrophin, we find that Plaintiff's request for an injunction compelling Defendant Retrophin to sell samples of Thiola to Plaintiff is moot.

Accordingly, we grant Defendants Retrophin's, Mission's, and Alamo's Motions to Dismiss under Rule 12(b)(1) as to the claim for injunctive relief, and we grant Plaintiff leave to amend. We deny Defendants Retrophin's, Mission's, and Alamo's

Motions to Dismiss under Rule 12(b)(1) regarding monetary
relief.

### _Motions to Dismiss Under Fed. R. Civ. P. 12(b)(2) for Lack of Personal Jurisdiction_

Under Rule 4, a federal District Court may have personal
jurisdiction over a defendant according to the law of the state
where the Court sits. Radio Music License Comm., Inc. v. Glob.
Music Rights, LLC, 2019 WL 1437981, at *20-21 (E.D. Pa. Mar. 29,
2019). Here, Pennsylvania's long-arm statute authorizes
jurisdiction to the extent permitted by the Due Process Clause.
Id. at *20-21 ("Pennsylvania's long-arm statute is coextensive
with the Due Process Clause . . . and permits the exercise of
personal jurisdiction over a non-resident to the extent allowed
by the United States Constitution.").

In the absence of an evidentiary hearing, the Court "'must
accept all of the plaintiff's allegations as true and construe
disputed facts in favor of the plaintiff.'" Commonwealth of
Pennsylvania by Kane v. Think Fin., Inc., 2016 WL 183289, at *27
(E.D. Pa. Jan. 14, 2016). See also Radio, 2019 WL 1437981, at
*2, *13 (Plaintiff, "as the non-moving party to a 12(b)(2)
motion without an evidentiary hearing, is entitled deference to
all well-pled factual allegations and the resolution of any
factual disputes in its favor . . . . Where a jurisdictional
challenge is raised and the Court does not hold an evidentiary

14

hearing, plaintiff need only establish a prima facie case of personal jurisdiction . . . . In this circumstance, a court must accept as true all uncontroverted allegations in the pleadings and all reasonable inferences therefrom.").

Nonetheless, when the defendant challenges personal jurisdiction, the plaintiff has the burden of proving that the Court has personal jurisdiction over the defendant. Patterson v. FBI, 893 F.2d 595, 603-04 (3d Cir. 1990); Radio, 2019 WL 1437981, at *13. In rebutting a Rule 12(b)(2) motion, the plaintiff must present facts through evidence, such as affidavits, and may not merely rely on allegations in the complaint. Patterson, 893 F.2d at 603-04; Radio, 2019 WL 1437981, at *13 ("'[O]nce the defense has been raised, then the plaintiff must sustain its burden of proof by establishing jurisdictional facts through sworn affidavits or other competent evidence' . . . . The proffered evidence must show 'with reasonable particularity the existence of sufficient contacts between the defendant and the forum state to support jurisdiction.' . . . . Where 'allegations are contradicted by an opposing affidavit . . . plaintiff[ ] must present similar evidence in support.'").

Accordingly, Courts may consider extrinsic evidence when adjudicating a contest to personal jurisdiction. Patterson, 893 F.2d at 603-04 ("A Rule 12(b)(2) motion . . . is inherently a

15

matter which requires resolution of factual issues outside the
pleadings, i.e. whether in personam jurisdiction actually
lies."); <u>Radio</u>, 2019 WL 1437981, at *13.

Though a Rule 12(b)(2) motion is distinct from a motion for
summary judgment, there are occasions where the jurisdictional
and merits questions are intertwined and, thus, "it may be
necessary for the district court 'to proceed to a decision which
impacts on the merits.'" <u>Patterson</u>, 893 F.2d at 604 ("A Rule
12(b)(2) motion cannot be treated as one for summary judgment.
There are situations, however, where 'the question of the
district court's jurisdiction [is] entwined with the ultimate
question on the merits'").

**I.   Defendant Mission**

Both Plaintiff and Mission contend that Mission "is a
corporation organized under the laws of the State of Texas, with
its principal place of business in San Antonio, Texas." (Doc.
No. 1 ¶21; Mission/Alamo Memorandum in Support of Their Motion
to Dismiss, Doc. No. 41, at 10.)

### a. *Personal Jurisdiction Under the Clayton Act*

Plaintiff contends that this Court has personal
jurisdiction over Defendant Mission under Section 12 of the
Clayton Act. Section 12 of the Clayton Act states that:

> Any suit, action, or proceeding under the antitrust laws
> against a corporation may be brought not only in the
> judicial district whereof it is an inhabitant, but also in

16

> any district wherein it may be found or transacts business;
> and all process in such cases may be served in the district
> of which it is an inhabitant, or wherever it may be found.

Clayton Act, 15 U.S.C. § 22. However, this provision does not
confer personal jurisdiction onto U.S. corporations. Radio, 2019
WL 1437981, at *21 ("[T]he Third Circuit Court of Appeals has
interpreted this section as only applying to foreign, non-U.S.,
corporations . . . . This provision has never been applied to
establish personal jurisdiction over a domestic antitrust
defendant . . . .").

Here, because Defendant Mission is a U.S. company, (Doc.
No. 1 ¶21; Doc. No. 41 at 10), Section 12 of the Clayton Act
does not confer on this Court personal jurisdiction over
Mission. See Radio, 2019 WL 1437981, at *21.

### b. *Alter Ego*

When the parent has sufficient control over its
subsidiary's daily operations, the subsidiary is an alter ego of
the parent for purposes of personal jurisdiction. Simeone ex
rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax
GmbH, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005) ("'A subsidiary
will be considered the alter-ego of its parent only if the
parent exercises control over the activities of the subsidiary'
. . . . More precisely, a plaintiff must prove that the parent
controls the day-to-day operations of the subsidiary such that
the subsidiary can be said to be a mere department of the

parent."). In this situation, a Court may have personal jurisdiction over the parent by virtue of the subsidiary's connection with the forum. Id.

In Simeone, 360 F. Supp. 2d 665, the Court focused on multiple factors in finding an alter ego relationship between the parent and subsidiary for purposes of personal jurisdiction: (1) the parent owned all of the subsidiary's stock; (2) the subsidiary had its own management team, but the parent had power to hire the subsidiary's CEO, who reported to a board that consisted partially of the parent's executives; (3) the subsidiary was akin to a department of the parent because annual reports often treated the parent and subsidiary as interchangeable; (4) and the parent and subsidiary shared a common marketing image, again because annual reports treated the parent and subsidiary as interchangeable; (5) the subsidiary received instructions from the parent because the parent "made major business decisions" for the subsidiary, such as whether to spin-off a part of the subsidiary; (6) the parent conducted performance reviews of the subsidiary and reviewed the subsidiary's budget; (7) a detailed policy manual dictated how the subsidiary should operate; and (8) the subsidiary sold 45% of its engines product to the parent. Id. at 676-78.

First, "Alamo is Mission's wholly-owned subsidiary." (Pl. Opposition to the Motions to Dismiss, Doc. No. 50 at 58. See

18

also Doc. No. 1 ¶22; Doc. No. 41 at 8.) Second, "Mission and
Alamo share at least some officers and directors," including
Mission's Chief Financial Officer. (Doc. No. 50 at 55, 58; id.,
Exs. 12 at 1; 22; 23; 24 at 1; 25 at 1; Doc. No. 41 at 11.)
Third, Mission and Alamo use at least some common employees.
(Doc. No. 50 at 55, 58; id., Exs. 12 at 1; 22; 23; 24 at 1; 25
at 1; 26; 27; Doc. No. 41 at 11.)

However, unlike in Simeone, 360 F. Supp. 2d 665, Plaintiff
does not prove that Alamo is akin to a department of Mission.
Though Plaintiff argues that Alamo's sales representatives
replaced an analogous team that Mission once had, (Doc. No. 50
at 58), this falls short of the standard in Simeone, 360 F.
Supp. 2d 665, where annual reports treated the parent and
subsidiary interchangeably. Simeone, 360 F. Supp. 2d 665 at 678.
Additionally, though Plaintiff argues that "Alamo markets and
sells Mission's products on behalf of Mission," (Doc. No. 50 at
58), Plaintiff does not allege, or present any evidence showing,
that Alamo received instructions from Mission or that Mission
controlled the daily operations of Alamo. Thus, we find that, on
the current record, Alamo is not an alter ego of Mission.

### c. *General Jurisdiction*

Courts may exercise general jurisdiction over defendants
whose contacts with the forum are "continuous and substantial,"
thus rendering the defendant "at home" in the forum state. Barth

19

v. Walt Disney Parks & Resorts U.S., Inc., 697 F. App'x 119 (3d
Cir. 2017), cert. denied, 138 S. Ct. 987, 119 (2018); Radio,
2019 WL 1437981, at *20. A defendant corporation is at home in
its state of incorporation and principal place of business.
Barth, 697 F. App'x at 119. In addition, a corporation may be at
home in a state where its activities are so substantial as to
render it at home in that state. Id. ("Also, in 'exceptional
case[s], ... a corporation's operations in a [different] forum .
. . may be so substantial and of such a nature as to render the
corporation at home in that State.'"). Crucially, general
jurisdiction does not turn on whether the defendant's activities
that give rise to the suit are connected to the forum. Radio,
2019 WL 1437981, at *20 ("General jurisdiction exists where a
nonresident's contacts with the forum are 'continuous and
substantial,' thus permitting the court to exercise jurisdiction
'regardless of whether the subject matter of the cause of action
has any connection to the forum.'").

In determining whether the corporation's operations render
it at home in the forum state, Courts consider several factors,
including: whether the defendant is qualified or licensed to do
business in the forum state; whether it has ever conducted
business in the forum state; whether it has offices or places of
business in the forum state; and whether it owns assets in the
forum state. Barth v. Walt Disney Parks & Resorts U.S., Inc.,

206 F. Supp. 3d 1026, 1030 (E.D. Pa. 2016), aff'd, 697 F. App'x
119 (3d Cir. 2017). See also Simeone, 360 F. Supp. 2d at 671.
Notably, even conducting substantial business in the forum state
is inadequate to render the corporation at home in that state.
Barth, 206 F. Supp. 3d at 1031 ("'The allegation that an entity
transacts business, even substantial business, in Pennsylvania
is insufficient to establish that it is essentially "at home" in
Pennsylvania.'").

Here, both Plaintiff and Mission contend that Mission "is a
corporation organized under the laws of the State of Texas, with
its principal place of business in San Antonio, Texas." (Doc.
No. 1 ¶21; Doc. No. 41 at 10.) Thus, the question here is
whether "this is an exceptional case," Barth, 206 F. Supp. 3d at
1030, where Mission's activities in Pennsylvania are "'so
substantial and of such a nature as to render the corporation at
home in that State.'" Barth, Inc., 697 F. App'x at 120.

Here, Plaintiff alleges that Mission has registered with
Pennsylvania's Department of Health under The Controlled
Substance, Drug, Device and Cosmetic Act, (Doc. No. 50 at 53;
id., Ex. 10); that Mission "employs sales representatives or
agents within Pennsylvania," (id. at 53); that the outdoor
signage on Alamo's location in Doylestown, Pennsylvania also
says "Mission Pharmacal," (id. at 55); that Mission's website
calls the Doylestown location "Mission's commercial office,"

21

(id.); and that some Mission employees physically work in various offices in Pennsylvania, (id. at 56.). Plaintiff alleges that Mission describes itself on its website as a "pharmaceutical company based in Pennsylvania and Texas." (Id., Ex. 17.)

However, establishing general jurisdiction in a forum where the defendant is neither incorporated nor has its principal place of business is an uphill battle. For instance, in BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549 (2017), the Supreme Court held that Montana courts did not have general jurisdiction over a defendant that had "over 2,000 miles of railroad track and more than 2,000 employees in Montana." BNSF, 137 S. Ct. at 1559. Accordingly, we find that Plaintiff has not sufficiently demonstrated that Mission is at home in Pennsylvania for purposes of general jurisdiction.

### d. *Specific Jurisdiction*

When general jurisdiction is lacking, the Court may have specific jurisdiction over a defendant whose contacts with the jurisdiction give rise to the suit. Radio, 2019 WL 1437981, at *21 ("In the absence of general jurisdiction, a court may exercise specific jurisdiction where a three-part test is met . . . ."). There are three requirements for a Court to have specific jurisdiction over a defendant: "(1) 'the defendant must have "purposefully directed [its] activities" at the forum'; (2)

'the litigation must "arise out of or relate to" at least one of those activities'; and (3) '. . . the exercise of jurisdiction otherwise "comport[s] with fair play and substantial justice." Id.

### i.  Purposefully Direct Activities at Forum

A defendant's "single purposeful act," UHS of Delaware, Inc. v. United Health Servs., Inc., 2013 WL 12086321, at *6 (M.D. Pa. Mar. 26, 2013), can create specific jurisdiction. Id. ("The Supreme Court and the Third Circuit Court of Appeals have found that a single purposeful act may be sufficient to support specific jurisdiction when it creates a 'substantial connection' that satisfies the requirements of due process . . . .").

According to nonbinding but persuasive authority from the Middle District of Pennsylvania, getting a license from the Pennsylvania Department of Health and Safety, and "then doing business under that license," id., is sufficient to establish "a substantial connection," id., to Pennsylvania. Id. ("Pennsylvania law forbids any entity from supplying home care services without first obtaining a license from the Pennsylvania Department of Health and Safety. 28 Pa. Code § 611.2. Clearly, [Defendant] PHCI formed a substantial connection through the act of obtaining a license to provide home care and later doing business under that license. PHCI's procurement of the license constitutes an explicit availment of the benefits and privileges

23

of doing business in the Commonwealth. PHCI would therefore have had every expectation that it was forging a connection with the state, precluding any suggestion that the contact is 'random, fortuitous, or attenuated.'").

The Court in UHS, 2013 WL 12086321 was further convinced of the defendant's substantial contacts with Pennsylvania because the defendant "then . . . [did] business under that license," id. at *6, and earned "some, albeit limited, revenues in Pennsylvania under this license." Id. ("That [Defendant] PHCI has actually transacted business, generating some, albeit limited, revenues in Pennsylvania under this license further substantiates the connection . . . . These contacts are emblematic of the Burger King axiom that specific jurisdiction attaches where 'the defendant purposefully avails itself of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its law.'").

Similar to the defendant in UHS, 2013 WL 12086321, Mission is licensed with the Pennsylvania Department of Health. (Doc. No. 50 at 53; id., Ex. 10.) The parties do not dispute that Mission has actually employed agents or representatives in Pennsylvania. (Id. at 53; Doc. No. 41 at 11.) Thus, Mission has purposefully directed its activities at Pennsylvania.

### ii. The Litigation Must Arise from Those Activities

Additionally, the litigation must arise out of those activities directed at the forum. See Radio, 2019 WL 1437981, at *21. Here, Plaintiff contends that litigation arose out of Mission's actions of employing a Mission Pennsylvania employee – the Vice President of Corporate Business Development – who: (1) served as the "point of contact" for the allegedly anticompetitive contract between Mission and Retrophin; (2) "confirmed receipt of the signed contract;" and (3) "coordinated substantial portions of the agreement." (Doc. No. 50 at 62.) Additionally, Mission concedes that "details [were] worked out by a Mission employee who operates out of the Doylestown[, Pennsylvania] office . . . ." (Doc. No. 41 at 14.) On the other hand, Plaintiff concedes that at least some "in-person negotiations" occurred outside of Pennsylvania. (Doc. No. 50 at 62.) Mission contends that: (1) the contract was negotiated outside of Pennsylvania, (Doc. No. 41 at 14); (2) "no meetings [about the contract] were ever held in Pennsylvania," (id.); and (3) the contract "was signed by Mission" outside of Pennsylvania, (id.) It appears that, at minimum, key aspects of the allegedly anticompetitive contract were coordinated by a relatively high-ranking Mission employee in Pennsylvania. We find that Plaintiff has carried its burden of proving that this suit arises out of Defendant's conduct of employing a

25

Pennsylvania employee who coordinated in creating the allegedly
anticompetitive contract. See Radio, 2019 WL 1437981, at *21.

### iii.   Due Process Clause

When the defendant has sufficient minimum contacts with the
forum, subjecting the defendant to suit in the forum usually
comports with the Due Process Clause. Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 477 (1985) ("[W]here a defendant who
purposefully has directed his activities at forum residents
seeks to defeat jurisdiction, he must present a compelling case
that the presence of some other considerations would render
jurisdiction unreasonable."). Courts focus on several factors in
determining where the Due Process Clause allows personal
jurisdiction. Id. at 476-77. The factors include: (1) "'the
burden on the defendant,' [2] 'the forum State's interest in
adjudicating the dispute,' [3] 'the plaintiff's interest in
obtaining convenient and effective relief,' [4] 'the interstate
judicial system's interest in obtaining the most efficient
resolution of controversies,' and [5] the 'shared interest of
the several States in furthering fundamental substantive social
policies.'" Id. at 477.

Though Mission is at home in Texas, it has multiple
employees in Pennsylvania, so the burden of litigating in
Pennsylvania would not violate the Due Process Clause.
Pennsylvania has an interest in the anticompetitive conduct of

Pennsylvania employees. While the Plaintiff is allegedly a
Virginia entity, Virginia is not so far as to render litigating
in Pennsylvania – Plaintiff's chosen forum – inconvenient and
ineffective for Plaintiff for purposes of the Due Process
Clause. Interstate judicial interests in efficiency point
towards a finding of specific jurisdiction because the claims
against two of Mission's co-Defendants will proceed in this
forum. Accordingly, we find that exercising specific
jurisdiction over Mission comports with the Due Process Clause.
See id.

Thus, we find that this Court has specific jurisdiction
over Mission. Accordingly, we deny Defendant Mission's Motion to
Dismiss for lack of personal jurisdiction under Rule 12(b)(2).
See Burger King, 471 U.S. at 477.

**II. Defendant Shkreli**

  **a. *General Jurisdiction***

Plaintiff does not argue that this Court has general
jurisdiction over Shkreli. (Doc. No. 50 at 50.) Thus, we will
not address general jurisdiction as to Shkreli.

  **b. *Specific Jurisdiction***

In determining jurisdiction over an individual employee,
Courts should evaluate the employee's contacts, not their
employer's contacts. Calder v. Jones, 465 U.S. 783, 790 (1984).
Additionally, Plaintiff does not allege that Retrophin's acts

27

should be imputed to Shkreli. (Doc. No. 50 at 51.) Thus, we
evaluate whether Shkreli's contacts are sufficient to establish
personal jurisdiction.

Plaintiff alleges that Shkreli signed the allegedly
anticompetitive agreement on behalf of Retrophin, (Doc. No. 1
¶20); "pushed through the negotiations," (Doc. No. 50 at 51);
and was personally "involved in negotiating the Agreement . . .
.", (id. at 5. See also Doc. No. 1 ¶27.) Under Element Fin.
Corp. v. ComQi, Inc., 52 F. Supp. 3d 739, 746-47 (E.D. Pa.
2014), the record is insufficient to determine whether Shkreli's
conduct regarding the contract could establish specific
jurisdiction over Shkreli.

### c. Jurisdictional Discovery

Plaintiff requests jurisdictional discovery in the event
that we find that Plaintiff has not shown personal jurisdiction
as to Defendant Shkreli. (Doc. No. 50 at 62, n.50.) Courts allow
jurisdictional discovery, rather than dismissal under 12(b)(2),
when: (1) plaintiff alleges "with reasonable particularity"
facts that support jurisdiction and (2) plaintiff's claim is not
"clearly frivolous." Toys "R" Us, Inc. v. Step Two, S.A., 318
F.3d 446, 456 (3d Cir. 2003) ("[C]ourts are to . . . allow[]
jurisdictional discovery unless the plaintiff's claim is
'clearly frivolous.' . . . . If a plaintiff presents factual
allegations that suggest 'with reasonable particularity' the

28

possible existence of the requisite 'contacts' . . . the
plaintiff's right to conduct jurisdictional discovery should be
sustained. Where the plaintiff has made this required threshold
showing, courts within this Circuit have sustained the right to
conduct discovery before the district court dismisses for lack
of personal jurisdiction.").

　　　As to Defendant Shkreli, Plaintiff's claim does not appear
frivolous. Thus, instead of dismissing Plaintiff's claims
against Defendant Shkreli for lack of personal jurisdiction, we
stay Defendant Shkreli's Motion to Dismiss under Rules 12(b)(2)
and 12(b)(6) for a period of ninety days to allow for limited
jurisdictional discovery on the question of whether this Court
may exercise specific jurisdiction over Shkreli.

**III.   Defendant Alamo**

　　　If a defendant litigates the merits of a complaint before
contesting personal jurisdiction, that defendant has consented
to personal jurisdiction in that forum. Richard v. U.S. Airways,
Inc., 2011 WL 248446, at *1 (E.D. Pa. Jan. 26, 2011) ("Personal
jurisdiction is a right that may be waived . . . . a party may
consent to personal jurisdiction if he or she 'actually
litigates the underlying merits . . . .'").

　　　Though Defendants Mission and Alamo filed a joint Motion to
Dismiss, (Doc. No. 41), in which Mission contends that this
Court lacks personal jurisdiction over Mission under Rule

12(b)(2), (Doc. No. 41 at 8, 17), Mission and Alamo contest only
the personal jurisdiction of Mission and do not contest the
personal jurisdiction of Alamo, (id.). Thus, Alamo has not moved
to dismiss Plaintiff's Complaint under Rule 12(b)(1) on grounds
that this Court lacks personal jurisdiction over Alamo, (id.),
and Alamo has litigated the merits of Plaintiff's claims (see
Doc. No. 41). Accordingly, Alamo has consented to personal
jurisdiction in this forum.

**IV.   Defendant Retrophin**

Like Alamo, Defendant Retrophin has not moved to dismiss
Plaintiff's Complaint under Rule 12(b)(2) for lack of personal
jurisdiction (Retrophin's Motion to Dismiss, Doc. No. 42; Doc.
No. 42-1) and has briefed the merits, (Doc. No. 42-1). Thus,
Retrophin has consented to personal jurisdiction in this forum.

*Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6) for Failure*
*to State a Claim*

Under 12(b)(6), "[t]he Court may grant a motion to dismiss
for failure to state a claim upon which relief can be granted
under Rule 12(b)(6) if, 'accepting all well-pleaded allegations
in the complaint as true, and viewing them in the light most
favorable to the plaintiff, plaintiff is not entitled to
relief.'" Ballentine, 486 F.3d at 810.

Unlike factual attacks under Rule 12(b)(1), in determining
motions to dismiss for failure to state a claim, Courts should

30

consider only "the complaint, exhibits attached to the
complaint, matters of public record, as well as undisputedly
authentic documents if the complainant's claims are based upon
these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir.
2010). See also Witasick v. Minnesota Mut. Life Ins. Co., 803
F.3d 184, 192 (3d Cir. 2015).

To survive a motion to dismiss under 12(b)(6), the
complaint must contain sufficient factual matter accepted as
true "to state a claim that is plausible on its face." Ashcroft
v. Iqbal, 556 U.S. 662, 697 (2009) (quoting Bell Atlantic Corp.
v. Twombly, 550 U.S. 544, 570 (2007)). Courts are to take as
true all of the factual allegations in the complaint and the
reasonable inferences that can be drawn from those facts.
Witasick, 803 F.3d at 192; Ethypharm S.A. Fr. v. Abbott
Laboratories, 707 F.3d 223, 225, n.1 (3d Cir. 2013).

Lastly, though defendants face a more difficult standard on
12(b)(6) motions to dismiss antitrust cases, "[t]he facts
underlying the elements of an antitrust claim must be pled with
specificity." Brotech Corp. v. White Eagle Int'l Techs. Grp.,
Inc., 2004 WL 1427136, at *3 (E.D. Pa. June 21, 2004). Courts
should disregard "legal conclusions and '[t]hreadbare recitals
of the elements of a cause of action, supported by mere
conclusory statements . . . ." Ethypharm, 707 F.3d at 231, n.14.

31

*Count I - Mandatory Injunctive Relief Pursuant to 15 U.S.C. § 26
and Fed. R. Civ. P. 65 Against All Defendants*

For the reasons described above in the section addressing
the mootness of Plaintiff's claims for injunctive relief, we
grant Defendants' Motions to Dismiss as to Count I with leave to
amend.

*Count II - Monopolization and/or Attempted Monopolization Under
Sherman Act Section 2 Against Defendant Retrophin; Count III -
Conspiracy to Monopolize Under Sherman Act Section 2 Against All
Defendants; and Count IV - Contract in Restraint of Trade Under
Sherman Act Section 1 Against All Defendants*

## I.   Antitrust Standing

Defendants Retrophin, Mission, and Alamo argue that
Plaintiff lacks prudential standing to bring suit under
antitrust laws. Separate from Article III's constitutional
standing, antitrust standing is a judge-made doctrine that
focuses on "whether the plaintiff is a proper party to bring
[the] private antitrust action." In re Wellbutrin XL Antitrust
Litig. Indirect Purchaser Class, 868 F.3d 132, 163-64 (3d Cir.
2017), judgment entered sub nom. In re Wellbutrin XL Antitrust
Litig., 2017 WL 3529114 (3d Cir. Aug. 9, 2017); Suboxone, 64 F.
Supp. 3d at 696.

First, in order to have antitrust standing, the private
plaintiff must demonstrate that it has suffered an antitrust
injury, which is "an injury of the type the antitrust laws were
intended to prevent and that flows from that which makes [the]

32

defendants' acts unlawful." <u>Wellbutrin</u>, 868 F.3d at 163–64
(internal quotations omitted). <u>See also</u> <u>Roxane Labs., Inc. v.</u>
<u>SmithKline Beecham Corp.</u>, 2010 WL 331704, at *2 (E.D. Pa. Jan.
26, 2010) ("Plaintiff must show proof of some damage resulting
from the unlawful behavior; a plaintiff 'need not exhaust all
possible alternative sources of injury.'").

Additionally, in light of the procompetitive purpose of
antitrust laws, Courts must also consider the injury from the
consumer's perspective, such as the impact on pricing, quantity,
and quality of the goods in the product market. <u>Brotech</u>, 2004 WL
1427136, at *4.

Second, the Court must consider the defendant's allegedly
anticompetitive conduct. <u>Roxane</u>, 2010 WL 331704, at *2.

Third, there must be a material causal connection between
the defendant's allegedly unlawful conduct and the plaintiff's
harm. <u>Id.</u> ("Whether a defendant may be held liable for a
plaintiff's injury requires courts to evaluate the plaintiff's
harm, the alleged wrongdoing by the defendants, and the
relationship between them . . . . This inquiry is a component of
antitrust standing . . . . As part of showing antitrust
standing, a private plaintiff must demonstrate . . . that the
defendant's alleged unlawful conduct was a material cause of
injury to its business or property.") (internal quotations
omitted).

Additionally, when the defendant argues that plaintiff's injury results from a reason other than defendant's allegedly illegal conduct, Courts must determine that the allegedly unlawful conduct, rather than the alternative reason, has caused plaintiff's harm. In re Wellbutrin SR/Zyban Antitrust Litig., 281 F. Supp. 2d 751, 756 (E.D. Pa. 2003) ("When a defendant relies upon the existence of an independent cause, however, such cause 'must be examined closely to make sure that it is the independent cause, rather than the illegal antitrust action, that gives rise to the plaintiff's injury.'").

Further, potential competitors must show "intention and preparedness to enter the market." Roxane, 2010 WL 331704, at *3 ("A plaintiff who was a "potential" competitor during the time of the alleged unlawful behavior - in other words, a competitor who had not yet entered the market - must demonstrate intention and preparedness to enter the market in order to show injury . . . . If a plaintiff cannot show it was ready to enter the market, 'there is unlikely to be any plausible evidence to show that defendants impeded this effort . . . .' If a plaintiff was unprepared to enter the market, then the defendant's behavior was not a but-for cause of plaintiff's inability to enter the market."); Brotech, 2004 WL 1427136, at *5-6 (On a motion to dismiss, "[a] competitor . . . that has not yet entered the market may also suffer injury[,] but courts require a potential

34

competitor to demonstrate both its intention to enter the market and its preparedness to do so . . . .") (internal quotations omitted).

In order to show "intention and preparedness," the plaintiff must prove: (1) that plaintiff had the background and experience to enter the market; (2) that plaintiff had the financial ability to enter the market; and, (3) most importantly, that plaintiff took affirmative actions to enter the market. Roxane, 2010 WL 331704, at *3; Brotech, 2004 WL 1427136, at *5-6 (On a motion to dismiss, "[t]he following factors are considered to be sufficient indicia of preparedness to enter the market: adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, such as the consummation of relevant contracts and procurement of necessary facilities and equipment.") (internal quotations omitted). Additionally, when the market entrant seeks FDA approval, whether the market entrant alleges either that the FDA is likely to approve its product or that it believes that the FDA is likely to approve its product is a "significant factor." Roxane, 2010 WL 331704, at *4 (stating that "the probability of FDA approval [is] . . . one significant factor to recognize within the intent and preparedness standard."); id. at *4, n.3 ("[T]here is little substantive difference between a plaintiff

35

generic manufacturer alleging in a complaint that FDA approval
was probable versus alleging that it anticipated that FDA
approval was probable. Further, a claimant can sufficiently show
intention and preparedness to enter a market with an allegation
that is framed subjectively, assuming such a belief is
accompanied by other factual allegations which in fact show
intent and preparedness."); Brotech, 2004 WL 1427136, at *6 ("As
the Amended Complaint does not allege facts establishing . . .
that FDA approval of said products is probable, the Court finds
that . . . the Amended Counterclaim is insufficient to state an
antitrust injury."). See also Andrx Pharm., Inc. v. Biovail
Corp. Int'l, 256 F.3d 799, 807 (D.C. Cir. 2001) ("Biovail did
not explicitly allege that it was prepared to bring a generic
version . . . to market or that it anticipated FDA approval . .
. . Based on Biovail's failure to plead sufficient intent and
preparedness to enter the market, the district court dismissed
Biovail's antitrust counterclaim.").

     In Roxane, 2010 WL 331704, the Court held that the
plaintiff, a potential competitor who alleged that defendant's
anticompetitive behavior delayed plaintiff's entry into the
market of Flonase brand name and generic nasal sprays, had
satisfied the "intent and preparedness" requirement during the
motion to dismiss stage. Id. at *4. Specifically, the Court
focused on the fact that: plaintiff "is a longstanding generic

36

drug manufacturer with over 20 years of experience marketing generic drugs in the United States . . . and possessed a familiarity with the FDA approval process," id.; plaintiff had taken affirmative actions to enter the market, such as submitting an ANDA, manufacturing the generic at issue in anticipation of approval, and possessing "manufacturing and distribution networks in place at the relevant time," id.; and plaintiff had "alleged that it reasonably believed that FDA approval was probable . . . , and that it intended to enter the market at this time." Id.

In Brotech, 2004 WL 1427136, the Court dismissed counterclaim-plaintiff's complaint because counterclaim-plaintiff – a potential competitor – had not sufficiently alleged "intent and preparedness." Id. at *5-6. Specifically, the Court pointed out that counterclaim-plaintiff did not allege how the FDA would categorize the devices using its product – a key factor that would impact the regulatory requirements of FDA approval; how much FDA review of such devices was necessary prior to marketing; how much plaintiff had done to get FDA approval of products incorporating its compound; when plaintiff anticipated FDA approval; whether FDA approval was likely; and whether plaintiff would be prepared to enter the relevant market once the FDA had granted approval. Id. at *6. Counterclaim-plaintiff's allegations that it was seeking FDA approval and

that FDA approval was required were, alone, insufficient to allege antitrust standing. Id. See also Roxane, 2010 WL 331704, at *4.

Plaintiff's claim rises or falls on whether Plaintiff sufficiently pleads "intent and preparedness" in the Complaint, Complaint's exhibits, matters of public record, and undisputedly authentic documents. See Mayer, 605 F.3d at 230. See also Witasick, 803 F.3d at 192.

Here, Plaintiff has failed to allege explicitly that the FDA is likely to approve its product or, alternatively, that Plaintiff believes that the FDA is likely to approve its product. Plaintiff's Exhibit A describes average FDA approval times, (Doc. No. 50, Ex. A Part 1 at 24-25), and the Complaint both describes the process of securing FDA approval under the ANDA process and states that FDA approval is required. (Doc. No. 1 ¶69 ("[B]efore Spring can market any generic version of Thiola, it must receive approval from the FDA that its proposed generic product is indeed 'bioequivalent' to Thiola. Such approval is conditioned on bioequivalence testing that requires that Spring obtain samples of Thiola."); id. ¶35 ("Then, once the generic manufacturer demonstrates bioequivalence and secures regulatory approval, including an 'AB' rating from the FDA - a designation conveying that the generic alternative has satisfied bioequivalence standards - the generic version becomes subject

38

to 'automatic substitution' laws in effect in most states, including Pennsylvania. These substitution laws require or allow pharmacists to substitute the AB-rated generic version of a product for the brand product, unless the prescribing physician specifically requests otherwise.").) However, as in <u>Brotech</u>, 2004 WL 1427136 - where the Court held that alleging FDA approval was both required and requested was insufficient to allege antitrust standing - Plaintiff's allegations that FDA approval is required, along with a description of the ANDA approval process, are likewise insufficient to establish "intent and preparedness." (<u>See</u> Doc. No. 1, Ex. A Part 1 at 24-25; <u>id.</u> ¶35); <u>Brotech</u>, 2004 WL 1427136, at *6. <u>See also</u> <u>Andrx</u>, 256 F.3d at 807; <u>Roxane</u>, 2010 WL 331704, at *4.

Additionally, Plaintiff has not adequately plead that it has taken sufficient affirmative steps to enter the market. Here, Plaintiff alleges in the Complaint that Plaintiff, or its founders, have (1) attempted to obtain Thiola samples, (Doc. No. 1 ¶¶70-76), had "discussions with pharmaceutical manufacturers, laboratories, and consultants regarding the development of a generic version of Thiola," (<u>id.</u> ¶78), "been in negotiations with multiple, experienced . . . CDMOs . . . regarding product development and manufacturing," (<u>id.</u>), "reached an agreement with one CDMO to perform the necessary development work once Spring is able to acquire the Thiola samples required to advance

39

the work," (id.), and had "discussions with expert consultants
who will assist with the necessary regulatory processes that
will be required to obtain approval of its generic version of
Thiola," (id. ¶79).

   While the definition of sufficient affirmative steps is not
precise, Plaintiff is clearly unlike the Roxane, 2010 WL 331704
plaintiff, who had submitted an ANDA and manufactured the
generic at issue in anticipation of approval. Id. at *4.
Additionally, unlike the Roxane, 2010 WL 331704 plaintiff, it is
unclear from the Complaint and exhibits whether Plaintiff here
has established sufficient manufacturing and distribution
networks because Plaintiff, in its Complaint, seems to allege
only one agreement and states without much detail that Plaintiff
had "discussions" without explaining how these discussions and
agreement constitute sufficient manufacturing and distribution
networks. (Doc. No. 1 ¶¶78-79.) See also Roxane, 2010 WL 331704,
at *4. Further, Brotech, 2004 WL 1427136 suggests that "relevant
contracts" must be consummated in order to establish "intent and
preparedness," id. at *5. Here, while Plaintiff alleges that it
has an agreement with a CDMO to complete the necessary
development work once Plaintiff obtains the needed samples,
(Doc. No. 1 ¶78), and has sought samples of Thiola for
bioequivalency testing, (id. ¶¶ 70-76), it is not clear whether
any other relevant contracts would be needed to reach FDA

approval and whether Plaintiff has started the process of securing those contracts.

Because Plaintiff has not adequately plead affirmative steps to enter the market or that FDA approval is probable, Plaintiff here has not established its "intent and preparedness" to enter the market. See Roxane, 2010 WL 331704, at *4; Brotech, 2004 WL 1427136, at *6. See also Andrx, 256 F.3d at 807.

Accordingly, we grant Defendant Retrophin's Motion to Dismiss Count II (monopolization and attempted monopolization under Sherman Act Section 2 against Defendant Retrophin) and Defendant Retrophin's, Mission's, and Alamo's Motions to Dismiss Count III (conspiracy to monopolize under Sherman Act Section 2 against all Defendants) and Count IV (contract in restraint of trade under Sherman Act Section 1 against all Defendants). We grant leave to amend.

### Count V - Unfair Competition Under Pennsylvania Common Law Against All Defendants

Plaintiff and Defendants Retrophin, Mission, and Alamo contend that Count V (unfair competition under Pennsylvania common law) is analogous to the federal antitrust claims. (Doc. No. 42-1 at 41; Doc. No. 45; Doc. No. 50 at 33.) Thus, because Plaintiff has failed to establish antitrust standing, we likewise dismiss Count V with leave to amend.

### Count VI - Unjust Enrichment Under Pennsylvania Common Law Against All Defendants

41

Unjust enrichment under Pennsylvania common law is available when: "(1) one party confers a benefit on the recipient, (2) the recipient appreciates that benefit, and (3) the recipient accepts and retains the benefit under such circumstances that it would be inequitable or unjust for the recipient to retain the benefit without payment." Southeastern. Pennsylvania Transp. Auth. v. Gilead Scis., Inc., 102 F. Supp. 3d 688, 704-05 (E.D. Pa. 2015). See also Stutzle v. Rhone-Poulenc S.A., 2003 WL 22250424, at *1 (Pa. Com. Pl. Sept. 26, 2003).

Courts do not permit antitrust plaintiffs to end run Pennsylvania's antitrust common law with claims under Pennsylvania's unjust enrichment common law. See Stutzle, 2003 WL 22250424, at *2 ("Moreover, to allow plaintiffs to use a claim for unjust enrichment as a means for collecting damages which are not allowable by Pennsylvania's antitrust law, is not a proper use of the claim and can only lead to mischief."). See also Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 937 (3d Cir. 1999) ("We can find no justification for permitting plaintiffs to proceed on their unjust enrichment claim once we have determined that the District Court properly dismissed the traditional tort claims because of the remoteness of plaintiffs' injuries from

42

defendants' wrongdoing."). See also Suboxone, 64 F. Supp. 3d at 703-04, 710 ("In any event, because I have previously found that the End Payors have stated a claim for a violation of Pennsylvania's consumer protection law, I do not find that allowing an unjust enrichment claim would provide an end-run around the Pennsylvania legislature's determination.").

As described above in our analysis on Plaintiff's federal antitrust claims, Plaintiff here has failed to allege a claim for unjust enrichment, especially in the absence of successful antitrust claims.

Thus, we likewise dismiss Count VI with leave to amend.

## Conclusion

We deny Defendants Retrophin's, Mission's, and Alamo's Rule 12(b)(1) Motions to Dismiss for lack of subject matter jurisdiction as to monetary relief and grant said Motions as to injunctive relief with leave to amend. We grant without prejudice Defendants Retrophin's, Alamo's, and Mission's Motions to Dismiss under 12(b)(6) for failure to state a claim as to all Counts, and we grant leave to amend. See Andrx, 256 F.3d at 808. We deny Defendant Mission's Motion to Dismiss for lack of personal jurisdiction under Rule 12(b)(2). We stay Defendant Shkreli's Motion to Dismiss for a period of ninety days to allow for limited jurisdiction discovery on the question of whether

43

this Court has specific jurisdiction over Shkreli. An

appropriate Order follows.